# UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

| | |
|---|---|
| MARISSA M. HENDRICKSON on behalf of herself and all others similarly situated, | Civil Action No. _____ |
| Plaintiff, | |
| vs. | |
| NAVIGANT CREDIT UNION, | **JURY TRIAL DEMANDED** |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiff Marissa M. Hendrickson ("Plaintiff"), on behalf of herself and all persons similarly situated, alleges the following based on personal knowledge as to the allegations regarding herself and on information and belief as to other allegations.

### INTRODUCTION

1.  This is a civil action seeking monetary damages, restitution and declaratory relief from Defendant, Navigant Credit Union ("Navigant"), arising from the unfair and unconscionable assessment and collection of "overdraft fees" ("OD Fees") on accounts that were never actually overdrawn, and for routinely charging more than one OD Fees or non-sufficient funds fees ("NSF Fee") on a single transaction.

2.  These practices breach contractual promises made in Navigant's adhesion contracts and constitute deceptive practices.

3.  In plain, clear, and simple language, the checking account contract documents discussing OD Fees promise that Navigant will only charge OD Fees on transactions where there are insufficient funds to "cover" them, and will only charge one such fee on a given transaction.

4.  As happened to Plaintiff, however, Navigant, in breach of its contract and the

1

covenant of good faith and fair dealing, charges OD Fees even when there are sufficient funds to "cover" a debit card transaction.

5.     Plaintiff does not dispute Navigant's right to either (a) reject a transaction and charge a single NSF Fee or (b) pay a transaction and charge a single OD Fee on a transaction that actually overdraws the account, but Navigant unlawfully maximizes its already profitable account fees with deceptive practices that also violate its contract.

6.     Specifically, Navigant also unlawfully assesses multiple fees on a single Automated Clearing House ("ACH") transaction or check.

7.     In Navigant's sole and undisclosed view, each time Navigant processes an ACH transaction or check for payment after having been rejected for insufficient funds, it becomes a new, unique item or transaction that is subject to another NSF Fee or OD Fee. But Navigant's "Account Documents" (as defined below) never even hint that this counterintuitive result could be possible.

8.     Navigant's contract indicates that only a single fee will be charged for however many times the request for payment is reprocessed. An electronic item reprocessed after an initial return for insufficient funds cannot and does not fairly become a new, unique item for fee assessment purposes.

9.     Navigant breaches its contract when it charges more than one fee on the same item, since the contract states—and reasonable consumers understand—that the same item can only incur a single NSF Fee or OD Fee.

10.    Navigant also breaches its duty of good faith and fair dealing when it charges multiple fees on a single transaction. Specifically, Navigant abuses its contractual discretion by (a) processing transactions when it knows full well that a customer's account lacks sufficient funds

and (b) charging NSF or OD Fees upon each reprocessing of the same item.

11.     Navigant's customers have been injured by Navigant's improper practices to the tune of millions of dollars bilked from their accounts in violation of their agreements with Navigant.

12.     The above-listed practices also violate Rhode Island Deceptive Trade Practices Act, R.I. Gen. Laws §§ 6-13.1-1, et seq. ("RIDTPA"), as Navigant's true practices are misrepresented to its customers.

13.     On behalf of herself and the Classes, Plaintiff seeks damages, restitution, and injunctive relief for Defendant's violations as set forth more fully below.

## JURISDICTION

14.     This Court has original jurisdiction over this putative class action lawsuit pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d)(2) & (6), because the aggregate sum of the claims of the members of the putative class exceeds $5 million, exclusive of interest and costs, because Plaintiff brings this action on behalf of a proposed class that is comprised of over one hundred members, and because at least one of the members of the proposed class is a citizen of a different state than Navigant.

## PARTIES

15.     Plaintiff Marissa M. Hendrickson is a citizen of Rhode Island.

16.     Defendant Navigant is one of Rhode Island's largest credit unions and is headquartered in Smithfield, Rhode Island.

## I.   NAVIGANT CHARGES OD FEES ON TRANSACTIONS THAT DO NOT ACTUALLY OVERDRAW THE ACCOUNT

### A.     Overview of Claim

17.     Plaintiff has a checking account with Navigant.

18.    Navigant issues debit cards to its checking account customers, including Plaintiff, which allows its customers to have electronic access to their checking accounts for purchases, payments, withdrawals and other electronic debit transactions.  Plaintiff is also able to conduct ACH and check transactions.

19.    Pursuant to its Account Documents, Navigant charges fees for debit card transactions that purportedly result in an overdraft.

20.    Plaintiff brings this cause of action challenging Navigant's practice of charging OD Fees on what are referred to in this complaint as "Authorize Positive, Purportedly Settle Negative Transactions" ("APPSN Transactions").

21.    Here's how it works. At the moment debit card transactions are authorized on an account with positive funds to cover the transaction, Navigant immediately reduces accountholders checking accounts for the amount of the purchase, sets aside funds in a checking account to cover that transaction, and as a result, the accountholder's displayed "available balance" reflects that subtracted amount. As a result, customers' accounts will always have sufficient available funds to cover these transactions because Navigant has already sequestered these funds for payment.

22.    However, Navigant still assesses crippling OD Fees on many of these transactions and mispresents its practices in its Account Documents.

23.    Despite putting aside sufficient available funds for debit card transactions at the time those transactions are authorized, Navigant later assesses OD Fees on those same transactions when they purportedly settle days later into a negative balance.  These types of transactions are APPSN Transactions.

24.    Navigant maintains a running account balance in real time, tracking funds accountholders have for immediate use. This running account balance is adjusted, in real-time, to

account for debit card transactions at the precise instance they are made. When a customer makes a purchase with a debit card, Navigant sequesters the funds needed to pay the transaction, subtracting the dollar amount of the transaction from the customer's available balance. Such funds are not available for any other use by the accountholder, and such funds are specifically associated with a given debit card transaction.

25.     Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles, as discussed in the Federal Register notice announcing revisions to certain provisions of the Truth in Lending Act regulations:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498-01 (Jan. 29, 2009).

26.     That means when any *subsequent*, intervening transactions are initiated on a checking account, they are compared against an account balance that has already been reduced to account for any earlier debit card transactions. This means that many subsequent transactions incur OD Fees due to the unavailability of the funds sequestered for those debit card transactions.

27.     Still, despite keeping those held funds off-limits for other transactions, Navigant improperly charges OD Fees on those APPSN Transactions, although the APPSN Transactions *always* have sufficient available funds to be covered.

28.     Indeed, the Consumer Financial Protection Bureau ("CFPB") has expressed

concern with this very issue, flatly calling the practice "unfair" and/or "deceptive" when:

> A financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive. At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions. Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing fees under these circumstances was found to be unfair.

Consumer Financial Protection Bureau, Winter 2015 "Supervisory Highlights."

29.     There is no justification for these practices, other than to maximize Navigant's OD Fee revenue. APPSN Transactions only exist because intervening checking account transactions supposedly reduce an account balance. But Navigant is free to protect its interests and either reject those intervening transactions or charge OD Fees on those intervening transactions—and it does

the latter to the tune of millions of dollars each year. But Navigant was not content with these millions in OD Fees. Instead, it sought millions *more* in OD Fees on these APPSN Transactions.

30.     Besides being unfair and unjust, these practices breach contract promises made in Navigant's adhesion contracts—contracts which fail to inform accountholders about, and in fact, misrepresent, the true nature of Navigant's processes and practices. These practices also exploit contractual discretion to gouge accountholders.

31.     In plain, clear, and simple language, the checking account contract documents covering OD Fees promise that Navigant will only charge OD Fees on transactions that have insufficient funds to "cover" that debit card transaction.

32.     In short, Navigant is not authorized by contract to charge OD Fees on transactions that have not overdrawn an account, but it has done so and continues to do so.

**A.      Mechanics of a Debit Card Transaction**

33.     A debit card transaction occurs in two parts. First, authorization for the purchase amount is instantaneously obtained by the merchant from Navigant. When a merchant physically or virtually "swipes" a customer's debit card, the credit card terminal connects, via an intermediary, to Navigant, which verifies that the customer's account is valid and that sufficient available funds exist to "cover" the transaction amount.

34.     At this step, if the transaction is approved, Navigant immediately decrements the funds in an accountholder's account and sequesters funds in the amount of the transaction but does not yet transfer the funds to the merchant.

35.     Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles, as discussed in the Federal Register notice announcing revisions to certain provisions of the Truth in Lending

Act regulations:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498-01 (Jan. 29, 2009).

36.     Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account.

37.     Navigant (like all credit unions and banks) decides whether to "pay" debit card transactions at authorization.  After that, Navigant is obligated to pay the transaction no matter what.  For debit card transactions, that moment of decision can only occur at the point of sale, at the instant the transaction is authorized or declined.  It is at that point—and only that point—when Navigant may choose to either pay the transaction or decline it. When the time comes to actually settle the transaction, it is too late—the financial institution has no discretion and must pay the charge. This "must pay" rule applies industry wide and requires that, once a financial institution authorizes a debit card transaction, it "must pay" it when the merchant later makes a demand, regardless of other account activity. *See* Electronic Fund Transfers, 74 Fed. Reg. 59033-01, 59046 (Nov. 17, 2009).

38.     There is no change—no impact whatsoever—to the available funds in an account when this step occurs.

B.      **Navigant's Account Documents**

39.     Amongst the Account Documents which governs Plaintiff's relationship with

Navigant is a document entitled, "Terms and Conditions of your Account" ("Terms and Conditions"), attached hereto as Exhibit A.

40.    The Terms and Conditions states in pertinent part, that Navigant will "charge fees for overdrafts caused by ATM withdrawals or one-time debit card transactions," if the consumer account has "opted-in to that service."

41.    The Terms and Conditions misrepresent to customers that OD Fees will only be charged when there is not enough money in the account to pay a transaction:

> OVERDRAFTS/INSUFFICIENT FUNDS - We determine from time to time during each business day whether or not your account contains sufficient available funds to pay a transaction (i.e., a check, in-person withdrawal, ATM withdrawal, point-of-sale transaction, or any other paper or electronic transaction).

Ex. A at 18.

42.    The Terms & Conditions also promises the available balance is the balance used to determine overdrafts; and that "available" funds are reduced for "temporary debit authorization holds," which are created by some debit card transactions:

> **A temporary debit authorization hold affects your account balance -** On debit card purchases, merchants may request a temporary hold on your account for a specified sum of money, which may be more than the actual amount of your purchase. When this happens, our processing system cannot determine that the amount of the hold exceeds the actual amount of your purchase. This temporary hold, and the amount charged to your account, will eventually be adjusted to the actual amount of your purchase, but it may be up to three days before the adjustment is made. Until the adjustment is made, the amount of funds in your account available for other transactions will be reduced by the amount of the temporary hold. If another transaction is presented for payment in an amount greater than the funds left after the deduction of the temporary hold amount, that transaction will be a nonsufficient funds (NSF) transaction if we do not pay it or an overdraft transaction if we do pay it. You will be charged an NSF or overdraft fee according to our NSF or overdraft fee policy. You will be charged the fee even if you would have had sufficient funds in your account if the amount of the hold had been equal to the amount of your purchase.

Here is an example of how this can occur - assume for this example the following: (1) you have opted-in to our overdraft services for the payment of overdrafts on ATM and everyday debit card transactions, (2) we pay the overdraft, and (3) our overdraft fee is $35 per overdraft, but we do not charge the overdraft fee if the transaction overdraws the account by less than $10.

You have $120 in your account. You swipe your card at the card reader on a gasoline pump. Since it is unclear what the final bill will be, the gas station's processing system immediately requests a hold on your account in a specified amount, for example, $80. Our processing system authorizes a temporary hold on your account in the amount of $80, and the gas station's processing system authorizes you to begin pumping gas. You fill your tank and the amount of gasoline you purchased is only $50. Our processing system shows that you have $40 in your account available for other transactions ($120 - $80 = $40) even though you would have $70 in your account available for other transactions if the amount of the temporary hold was equal to the amount of your purchase ($120 - $50 = $70). Later, another transaction you have authorized is presented for payment from your account in the amount of $60 (this could be a check you have written, another debit card transaction, an ACH debit or any other kind of payment request). This other transaction is presented before the amount of the temporary hold is adjusted to the amount of your purchase (remember, it may take up to three days for the adjustment to be made). Because the amount of this other transaction is greater than the amount our processing system shows is available in your account, our payment of this transaction will result in an overdraft transaction. Because the transaction overdraws your account by $20, your account will be assessed the overdraft fee of $35 according to our overdraft fee policy. You will be charged this $35 fee according to our policy even though you would have had enough money in your account to cover the $60 transaction if your account had only been debited the amount of your purchase rather than the amount of the temporary hold or if the temporary hold had already been adjusted to the actual amount of your purchase.

Ex. A at 12-13.

43.    Likewise, another Account Document, the "Overdraft Disclosure", attached hereto as Exhibit B, states: "An overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway."

44.    The Consumer Fee Schedule, attached hereto as Exhibit C, provides, *inter alia*, the amount of each NSF Fee or OD Fee charged to the consumer at any given time and does not disclose that multiple fees could be charged for a single transaction.

45.    For debit card transactions, the credit union decides whether to authorize a request

for a temporary hold on an account at the moment the request is made, thus immediately reducing the available balance. Navigant represents to its customers that it is one step, just like consumers using debit cards believe.

46.     For APPSN Transactions, which are immediately deducted from a positive account balance and held aside for payment of that same transaction, there are always funds to cover those transactions—yet Navigant assesses OD Fees on them anyway.

47.     The above promise means that transactions are only overdraft transactions when they are authorized into a negative account balance. Of course, that is not true for APPSN Transactions.

48.     APPSN transactions are always *initiated* at the time the customer swipes the debit card when there are sufficient available funds in the account.

49.     In fact, Navigant actually authorizes transactions on positive funds, sets those funds aside on hold, then fails to use those same funds to settle those same transactions. Instead, it uses a secret posting process described below.

50.     All the above representations and contractual promises are untrue. In fact, Navigant charges OD Fees even when sufficient funds exist to cover transactions that are authorized into a positive balance. No express language in any document states that Navigant may impose OD Fees on any APPSN Transactions.

51.     Another Account Document, the Overdraft Disclosure also indicates that Navigant will only charge OD Fees when it *authorizes and pays* a transaction:

> ☐ What are the standard overdraft practices that come with my account?
>> We do *authorize and pay* overdrafts for the following types of transactions:
>>> ☐ Checks and other transactions made using your checking account number
>>> ☐ Automatic bill payments
>> We will not *authorize and pay overdrafts* for the following types of

transactions without your consent.
       ☐ ATM transactions
       ☐ Everyday debit card transactions

Ex. B.

52.     For debit card transactions, the credit union decides whether to "authorize and pay" a debit card transaction at the moment of authorization.  Navigant represents to its customers that it is one step, just like consumers using debit cards believe.

53.     For APPSN Transactions, which are immediately deducted from a positive account balance and held aside for payment of that same transaction, there are *always* funds to "cover" those transactions—yet Navigant assesses OD Fees on them anyway.

54.     The above promises indicate that transactions are only overdraft transactions when they are authorized into a negative account balance.  Of course, that is not true for APPSN transactions.

55.     The Account Documents misconstrue Navigant's true debit card processing and overdraft practices.

56.     First, and most fundamentally, Navigant charges OD Fees on debit card transactions for which there are sufficient funds available to cover the transactions. That is despite contractual representations that Navigant will only charge OD Fees on transactions with insufficient available funds to cover a given transaction.

57.     Navigant assesses OD Fees on APPSN Transactions that ***do*** have sufficient funds available to cover them throughout their lifecycle.

58.     Navigant's practice of charging OD Fees even when sufficient available funds exist to cover a transaction violates a contractual promise not to do so. This discrepancy between Navigant's actual practice and the contract causes accountholders like the Plaintiff to incur more OD Fees than they should.

59.     Next, sufficient funds for APPSN Transactions are actually debited from the account immediately, consistent with standard industry practice.

60.     Because these withdrawals take place upon initiation, they cannot be re-debited later. But that is what Navigant does when it re-debits the account during a secret batching posting process.

61.     In reality, Navigant's actual practice is to assay the same debit card transaction twice to determine if the transaction overdraws an account—both at the time a transaction is authorized and later at the time of settlement.

62.     At the time of settlement, however, an available balance *does not change at all* for these transactions previously authorized into good funds. As such, Navigant cannot then charge an OD Fee on such transaction because the available balance has not been rendered insufficient due to the pseudo-event of settlement.

63.     Upon information and belief, something more is going on: at the moment a debit card transaction is getting ready to settle, Navigant does something new and unexpected, during the middle of the night, during its nightly batch posting process. Specifically, Navigant releases the hold placed on funds for the transaction for a split second, putting money back into the account, then re-debits the same transaction a second time.

64.     This secret step allows Navigant to charge OD Fees on transactions that never should have caused an overdraft—transactions that were authorized into sufficient funds, and for which Navigant specifically set aside money to pay them.

65.     This discrepancy between Navigant's actual practices and the contract causes accountholders to incur more OD Fees than they should.

66.     In sum, there is a huge gap between Navigant's practices as described in the

Account Documents and Navigant's practices in reality.

**C.**   **Navigant Abuses Contractual Discretion**

67.     Navigant's treatment of debit card transactions to charge OD Fees is more than a breach of the express terms of the numerous Account Documents. In addition, Navigant exploits contractual discretion to the detriment of accountholders when it uses these policies.  For instance, Navigant grants itself the contractual discretion that, "You agree that we may charge fees for overdrafts." Ex A.  Navigant abuses this discretion.

68.     Moreover, Navigant uses its contractual discretion to cause APPSN Transactions to incur OD Fees by knowingly authorizing later transactions that it allows to consume available funds previously sequestered for APPSN Transactions.

69.     Navigant uses these contractual discretion points unfairly to extract OD Fees on transactions that no reasonable accountholder would believe could cause OD Fees.

**D.**   **Reasonable Accountholders Understand Debit Card Transactions are Debited Immediately**

70.     The assessment of OD Fees on APPSN Transactions is fundamentally inconsistent with immediate withdrawal of funds for debit card transactions. That is because if funds are immediately debited, they cannot be depleted by intervening transactions (and it is that subsequent depletion that is the necessary condition of APPSN Transactions). If funds are immediately debited, then, they are necessarily applied to the debit card transactions for which they are debited.

71.     Navigant was and is aware that this is precisely how accountholders reasonably understand debit card transactions to work.

72.     Navigant knows that many accountholders prefer debit cards for these very reasons. Research indicates that accountholders prefer debit cards as a budgeting device because they don't allow debt like credit cards do, and because the money comes directly out of a checking account.

73.     Consumer Action, a national nonprofit consumer education and advocacy organization, advises consumers determining whether they should use a debit card that "[t]here is no grace period on debit card purchases the way there is on credit card purchases; the money is immediately deducted from your checking account. Also, when you use a debit card you lose the one or two days of 'float' time that a check usually takes to clear." *What Do I Need to Know About Using a Debit Card?*, ConsumerAction (Jan. 14, 2019), https://www.consumer-action.org/helpdesk/articles/what_do_i_need_to_know_about_using_a_debit_card.

74.     Further, Consumer Action informs consumers that "Debit cards offer the convenience of paying with plastic without the risk of overspending. When you use a debit card, you do not get a monthly bill. You also avoid the finance charges and debt that can come with a credit card if not paid off in full." *Understanding Debit Cards*, ConsumerAction, http://www.consumer-action.org/english/articles/understanding_debit_cards   (last   visited December 18, 2019).

75.     This understand is a large part of the reason that debit cards have risen in popularity. The number of terminals that accept debit cards in the United States has increased by approximately 1.4 million in the last five years, and with that increasing ubiquity, consumers have (along with credit cards) viewed debit cards "as a more convenient option than refilling their wallets with cash from an ATM." Maria LaMagna, *Debit Cards Gaining on Case for Smallest Purchases,* MarketWatch, Mar. 23, 2016, http://www.marketwatch.com/story/more-people-are-using-debit-cards-to-buy-a-pack-of-gum-2016-03-23.

76.     Not only have accountholders increasingly transitioned from cash to debit cards, but they believe that a debit card purchase is the fundamental equivalent of a cash purchase, with the swipe of a card equating to handing over cash, permanently and irreversibly.

77.     Navigant was aware of the accountholder perception that debit transactions reduce an available balance *in a specified order*—namely, the moment they are actually initiated—and its account agreement only supports this perception.

**E.     Plaintiff's Debit Card Transactions**

78.     On March 18, 2019, Plaintiff made a debit card transaction at McDonald's.  At the time, Plaintiff had enough money in her account to cover the transaction.

79.     As another example, on April 2, 2019, Plaintiff made a debit card transaction at CT Gas.  At the time, Plaintiff had enough money in her account to cover the transaction.

80.     However, Plaintiff was assessed a $34 OD Fee for those APPSN debit card transactions that settled on those days, despite the fact that positive funds were deducted, despite the fact that positive funds were deducted immediately, when Plaintiff had a positive balance.

**II.     NAVIGANT CHARGES TWO OR MORE FEES ON THE SAME ITEM**

81.     As alleged more fully herein, Navigant's Account Documents allow it to take certain steps when its accountholders attempt a transaction but do not have sufficient funds to cover it. Specifically, Navigant may (a) authorize the transaction and charge a *single* OD Fee; or (b) reject the transaction and charge a *single* NSF Fee.

82.     In contrast to its Account Documents, however, Navigant regularly assesses two or more NSF Fees, or an OD Fee after an NSF Fee(s) on the *same* item or transaction.

83.     This abusive practice is not universal in the financial services industry. Indeed, major banks like Chase—the largest consumer bank in the country—do not undertake the practice of charging more than one Fee on the same item when it is reprocessed. Instead, Chase charges one NSF Fee even if a transaction is resubmitted for payment multiple times.

84.     Navigant's Account Documents never disclose this practice. To the contrary, Navigant's Account Documents indicate it will only charge a single NSF Fee on an item or per transaction.

### A. Plaintiff's Experience

85.     In support of her claims, Plaintiff offers an example of multiple fees that should not have been assessed against her checking account. As alleged below, Navigant: (a) reprocessed a previously declined transaction; and (b) charged a fee upon reprocessing.

86.     On May 14, 2019, Plaintiff attempted a single payment in the amount of $260.00.

87.     Navigant rejected payment of that transaction due to insufficient funds in Plaintiff's account, and the next day, charged her a $34 "Insufficient Funds Fee", an NSF Fee, for doing so. Plaintiff does not dispute the initial fee, as it is allowed by Navigant Account Documents.

88.     Then, on May 23, 2019, Navigant again rejected the payment, and charged a *second* $34 NSF Fee.

89.     *In sum, Navigant charged Plaintiff $68 in fees to attempt to process a single payment.*

90.     As another example, on June 5, 2019, Plaintiff attempted a single payment in the amount of $167.67.

91.     Navigant rejected payment of that transaction due to insufficient funds in Plaintiff's account, and the next day, charged her a $34 "Insufficient Funds Fee", an NSF Fee, for doing so. Once again, Plaintiff does not dispute the initial fee, as it is allowed by Navigant Account Documents.

92.     Then, on June 11, 2019, Navigant again rejected the payment, and charged a *second* $34 NSF Fee.

93.     Again, in sum, Navigant charged Plaintiff $68 in fees to attempt to process a single payment.

94.     Plaintiff understood the payment to be a single transaction as is laid out in Navigant's Account Documents, capable at most of receiving a single NSF Fee (if Navigant returned it) or a single OD Fee (if Navigant paid it).

95.     Navigant expressly referred to these duplicated series of transactions on Ms. Hendrickson's account statement as a "Pending," "Completed," and "Rejected," indicating even Navigant understood this transaction to be another iteration of the same authorization for payment

96.     The same pattern occurred numerous times for Plaintiff, with Navigant charging multiple fees for a single transaction.

**B.  The Imposition of Multiple Fees on a Single Transaction Violates Navigant's Express Promises and Representations**

97.     The Account Documents provide the general terms of Plaintiff's relationship with Navigant and therein Navigant makes explicit promises and representations regarding how transactions will be processed, as well as when NSF Fees and OD Fees may be assessed.

98.     The Account Documents explicitly state that fees will only be assessed once per transaction or single item—e.g. a customer request for payment or transfer—when in fact Navigant regularly charges two or more fees per transaction or single item even though a customer only requested the payment or transfer once.

99.     Navigant's Account Documents indicate that a singular Fee can be assessed on checks, ACH debits, and electronic payments.

100.    Navigant's Account Documents state that it will charge a single fee per item or transaction that is returned due to insufficient funds.

101.    According to the Deposit Agreement, at most a single fee will be assessed when a check or debit item is "written":

> If a check, item or transaction is presented without sufficient funds in your account to pay it, we may, at our discretion, pay the item (creating an overdraft) or return the item for insufficient funds (NSF).

Ex. A at 17.

102.    The same item or transaction cannot conceivably become a new one each time it is rejected for payment then reprocessed, especially when—as here—Plaintiff took no action to resubmit it.

103.    There is zero indication anywhere in the Account Documents that the same "check" "item", or "transaction" is eligible to incur multiple NSF Fees, or an NSF Fee followed by an OD Fee.

104.    The same "item" on an account cannot conceivably become a new item each time it is rejected for payment then reprocessed, especially when—as here—Plaintiff took no action to reprocess it.

105.    There is zero indication anywhere in the Account Documents that the same "item" is eligible to incur multiple fees.

106.    In fact, the Terms & Condition indicate otherwise, that a single NSF Fee or OD Fee could be charged, but not multiple, as if there is not enough money to cover a transaction: "You will be charged an NSF or overdraft fee according to our NSF or overdraft fee policy." Ex. A (emphasis added).

107.    Even if Navigant reprocesses an instruction for payment, it is still the same "item." Navigant's reprocessing is simply another attempt to effectuate an accountholder's original order or instruction.

108.    The Account Documents described never discuss a circumstance where Navigant may assess multiple fees for a single check or ACH transaction that was returned for insufficient funds and later reprocessed one or more times and returned again.

109.    In sum, Navigant promises that one fee will be assessed per electronic payment or check, and these terms must mean all iterations of the same instruction for payment. As such, Navigant breached the contract when it charged more than one fee per item.

110.    Reasonable consumers understand any given authorization for payment to be one, singular item, payment, or transaction.

111.    Taken together, the representations and omissions identified above convey to customers that all submissions for payment of the same transaction will be treated as the same item, which Navigant will either authorize (resulting in an overdraft item) or reject (resulting in a returned item) when it decides there are insufficient funds in the account. Nowhere does Navigant disclose that it will treat each reprocessing of a check or ACH payment as a separate item, subject to additional fees, nor have Navigant customers ever agree to such fees or practices.

112.    Customers reasonably understand, based on the language of the Account Documents and Navigant's other documents, that Navigant's reprocessing of checks or ACH payments are simply additional attempts to complete the original order or instruction for payment, and as such, will not trigger NSF Fees or an OD Fee if the transactions is later paid. In other words, it is always the same item or transaction.

113.     Banks and credit unions, like Navigant, that employ this abusive practice know how to plainly and clearly disclose it. Indeed, other banks and credit unions that do engage in this abusive practice disclose it expressly to their accountholders—something Navigant never did here.

114.     For example, First Citizens Bank, a major institution in the Carolinas, engages in the same abusive practice as Navigant, but at least expressly states:

> Because we may charge a service fee for an NSF item each time it is presented, **we may charge you more than one service fee for any given item**. All fees are charged during evening posting. When we charge a fee for NSF items, the charge reduces the available balance in your account and may put your account into (or further into) overdraft.

*Deposit Account Agreement*, First Citizen's Bank (Sept. 2018), https://www.firstcitizens.com/ personal/banking/deposit-agreement (emphasis added).

115.     First Hawaiian Bank engages in the same abusive practices as Navigant, but at least currently discloses it in its online banking agreement, in all capital letters, as follows:

> YOU AGREE THAT MULTIPLE ATTEMPTS MAY BE MADE TO SUBMIT A RETURNED ITEM FOR PAYMENT AND THAT **MULTIPLE FEES MAY BE CHARGED TO YOU AS A RESULT OF A RETURNED ITEM AND RESUBMISSION**.

*Terms and Conditions of FHB Online Services*, First Hawaiian Bank 40, https://www. fhb.com/ en/assets/File/Home_Banking/FHB_Online/Terms_and_Conditions_of_FHB_Online_Services_ RXP1.pdf (last accessed December 19, 2019) (emphasis added).

116.     Klein Bank similarly states in its online banking agreement:

> [W]e will charge you an NSF/Overdraft Fee each time: (1) a Bill Payment (electronic or check) is submitted to us for payment from your Bill Payment Account when, at the time of posting, your Bill Payment Account is overdrawn, would be overdrawn if we paid the item (whether or not we in fact pay it) or does not have sufficient available funds; or (2) we return, reverse, or decline to pay an item for any other reason authorized by the terms and conditions governing your Bill Payment Account. **We will charge an NSF/Overdraft Fee as provided in this**

> section regardless of the number of times an item is submitted or resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the bill payment.

*Special Handling/Electronic Banking Disclosures of Charges*, First Financial Bank 2 (Aug. 2018), https://www.bankatfirst.com/content/dam/first-financial-bank/eBanking_Disclosure_of_Charges.pdf (last accessed December 12, 2019) (emphasis added).

117.   Navigant provides no such disclosure, and in so doing, deceives its accountholders.

## C. The Imposition of Multiple Fees on a Single Transaction Breaches Navigant's Duty of Good Faith and Fair Dealing

118.   Parties to a contract are required not only to adhere to the express conditions in the contract, but also to act in good faith when they are invested with a discretionary power over the other party. This creates an implied promise to act in accordance with the parties' reasonable expectations and means that Navigant is prohibited from exercising its discretion to enrich itself and gouge its customers. Indeed, Navigant has a duty to honor transaction requests in a way that is fair to Plaintiff and its other customers and is prohibited from exercising its discretion to pile on ever greater penalties on the depositor.

119.   Here—in the adhesion agreements Navigant foisted on Plaintiff and its other customers—Navigant has provided itself numerous discretionary powers affecting customers' credit union account, for instance:

> If a check, item or transaction is presented without sufficient funds in your account to pay it, we may, at our discretion, pay the item (creating an overdraft) or return the item for insufficient funds (NSF).

Ex. A at 17.

120.   But instead of exercising that discretion in good faith and consistent with consumers' reasonable expectations, Navigant abuses that discretion to take money out of

consumers' account without their permission and contrary to their reasonable expectations that they will not be charged multiple fees for the same transaction.

121.    Navigant abuses the power it has over customers and their credit union accounts and acts contrary to reasonable expectations under the Account Documents when it charges fees on each iteration of the same payment. This is a breach of Navigant's implied covenant to engage in fair dealing and to act in good faith.

122.    Further, Navigant maintains complete discretion not to assess NSF Fees or OD Fees on transactions at all. By exercising its discretion in its own favor—and to the prejudice of Plaintiff and other customers—by charging more than one fee on a single item, Navigant breaches the reasonable expectation of Plaintiff and other customers and in doing so violates the implied covenant to act in good faith.

123.    It was bad faith and totally outside Plaintiff's reasonable expectations for Navigant to use its discretion to assess two or more fees for a single attempted payment.

124.    When Navigant charges multiple fees, Navigant uses its discretion to define the meaning of "item" in an unreasonable way that violates common sense and reasonable consumer expectations. Navigant uses its contractual discretion to set the meaning of those terms to choose a meaning that directly causes more fees.

## CLASS ACTION ALLEGATIONS

125.    Plaintiff brings this action on behalf of herself and on behalf of all others similarly situated pursuant to F.R.C.P. 23. The Classes are defined as:

> All consumers who, during the applicable statute of limitations, were charged OD Fees on APPSN Transactions on a Navigant checking account (the "OD Fees Class").

> All consumers who, during the applicable statute of limitations, were charged multiple fees on the same item on a Navigant checking account (the "Multiple Fees

Class").

126.    Excluded from the Classes are Defendant, Defendant's subsidiaries and affiliates, their officers, directors and member of their immediate families and any entity in which Defendant has a controlling interest, the legal representatives, heirs, successors or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

127.    Plaintiff reserves the right to modify or amend the definition of the proposed Classes and/or to add a subclass(es), if necessary, before this Court determines whether certification is appropriate.

128.    The questions here are ones of common or general interest such that there is a well-defined community of interest among the members of the Classes. These questions predominate over questions that may affect only individual class members because Navigant has acted on grounds generally applicable to the class.  Such common legal or factual questions include, but are not limited to:

a)   Whether Navigant improperly charged OD Fees on APPSN Transactions;

b)   Whether Navigant improperly charged multiple fees on the same transactions;

c)   Whether the conduct enumerated above violates the contract;

d)   Whether the conduct enumerated above violates the covenant of good faith and fair dealing;

e)   Whether the conduct enumerated above violates RIDTPA; and

f)   The appropriate measure of damages.

129.    The parties are numerous such that joinder is impracticable.  Upon information and belief, and subject to class discovery, the Classes consist of thousands of members or more, the identity of whom are within the exclusive knowledge of and can be ascertained only by resort to

Navigant's records.  Navigant has the administrative capability through its computer systems and other records to identify all members of the Classes, and such specific information is not otherwise available to Plaintiff.

130.    It is impracticable to bring members of the Classes individual claims before the Court. Class treatment permits a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort, expense, or the possibility of inconsistent or contradictory judgments that numerous individual actions would engender.  The benefits of the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

131.    Plaintiff's claims are typical of the claims of the other members of the Classes in that they arise out of the same wrongful business practices by Navigant, as described herein.

132.    Plaintiff is a more than adequate representative of the Classes in that Plaintiff is a Navigant checking accountholder and has suffered damages as a result of Navigant's contract violations.  In addition:

a)  Plaintiff is committed to the vigorous prosecution of this action on behalf of herself and all others similarly situated and has retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of accountholders against financial institutions;

b)  There is no conflict of interest between Plaintiff and the unnamed members of the Class;

c)  Plaintiff anticipates no difficulty in the management of this litigation as a class

action; and

    d)  Plaintiff's legal counsel has the financial and legal resources to meet the substantial

costs and legal issues associated with this type of litigation.

133.    Plaintiff knows of no difficulty to be encountered in the maintenance of this action

that would preclude its maintenance as a class action.

134.    Navigant has acted or refused to act on grounds generally applicable to the class,

thereby making appropriate corresponding declaratory relief with respect to the Class as a whole.

135.    All conditions precedent to bringing this action have been satisfied and/or waived.

**COUNT I**
**BREACH OF CONTRACT INCLUDING THE**
**COVENANT OF GOOD FAITH AND FAIR DEALING**
**(Individually and on Behalf of the Classes)**

136.    Plaintiff repeats and incorporates all of the preceding allegations as if fully set forth

herein.

137.    Plaintiff, and all members of the proposed Classes contracted with Navigant for

checking account services, including debit card services.

138.    Navigant breached promises made to Plaintiff and all members of the proposed

class when, as alleged herein, Navigant charged OD Fees on APPSN Transactions.

139.    Navigant also breached promises made to Plaintiff and all members of the proposed

Multi Fees Class when, as alleged herein, Navigant charged multiple fees on the same transactions.

140.    In addition, there exists an implied covenant of good faith and fair dealing in all

contracts that neither party shall do anything which will have the effect of destroying or injuring

the right of the other party to receive the fruits of the contract. Good faith and fair dealing, in

connection with executing contracts and discharging performance and other duties according to

their terms, means preserving the spirit – not merely the letter – of the bargain. Put differently,

the parties to a contract are mutually obligated to comply with the substance of their contract in

addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

141.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified.  Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.  Examples of bad faith are evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

142.    The implied covenant of good faith and fair dealing applies to the performance and enforcement of contracts, limits the parties' conduct when their contract defers decision on a particular term, omits terms, or provides ambiguous terms.

143.    Navigant has breached the covenant of good faith and fair dealing and abused its discretion in its contract as described herein.  Specifically, Navigant should not have used its discretion to charge OD Fees on APPSN Transactions or multiple NSF Fees on the same transaction. The Account Agreements do not have a contract term permitting OD Fees on such transactions, nor multiple fees on the same transaction, and the documents are otherwise ambiguous as to any right for Navigant to charge OD Fees on APPSN Transactions or multiple fees on the same transaction.

144.    Plaintiff and all members of the proposed Classes have performed all, or substantially all, of the obligations imposed on them under the contract.

145.    Plaintiff and all members of the proposed Classes have sustained damages as a result of Navigant's breaches of the contract.

## COUNT II
## VIOLATION OF THE RHODE ISLAND DECEPTIVE TRADE PRACTICES ACT
### (Individually and on Behalf of the Classes)

146.    Plaintiff repeats and incorporates all of the preceding allegations as if fully set forth herein.

147.    Plaintiff asserts this Second Cause of Action individually and on behalf of all members of the Classes against Defendant for violation of the Rhode Island Deceptive Trade

Practices Act.

148. Plaintiff and members of the Classes were issued debit cards by Navigant, which were linked to respective checking accounts, and their checking accounts authorized them to conduct ACH and check transactions.

149. Defendant violated the RIDTPA by engaging in the practices and conduct complained of herein, affirmative misrepresentations and knowingly and intentionally employing an unfair and deceptive policies and practices of assessing OD and NSF Fees; and misrepresenting its policies and practices of assessing OD and NSF Fees.

150. Specifically, Defendant assesses these crippling OD and NSF Fees on these transactions by mispresenting its practices in its Account Documents.

151. Navigant also engaged in unlawful conduct in violation of the RIDTPA by making knowing and intentional omissions. Navigant knowingly failed to disclose its policies and practices of assessing OD and NSF Fees in its Account Documents.

152. Navigant intended that Plaintiff and putative class members rely on the acts of concealment and omissions, so that Plaintiff and putative class members would continue to incur overdraft fees.

153. Navigant's conduct caused Plaintiff and putative class members to suffer ascertainable losses in the form of excessive OD Fees and NSF Fees that, but for Navigant's unfair and deceptive practices and policies, would not otherwise have been imposed.

154. A causal relationship exists between Navigant's unlawful conduct and the ascertainable losses suffered by Plaintiff and the Classes. Had Navigant not acted unlawfully, Plaintiff and putative class members would not have incurred excessive overdraft fees in violation of the RIDTPA.

155. As redress for Navigant's repeated and ongoing violations of the RIDTPA, Plaintiff and putative class members are entitled to, inter alia, damages and declaratory relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Classes, demands a jury trial on

all claims so triable and judgment as follows:

A.   Certification for this matter to proceed as a class action on behalf of the Classes;

B.   Declaring Navigant's OD Fee and multiple fee policies and practices to be in breach of its contract with accountholders;

C.   Restitution of all OD Fees and multiple fees paid to Navigant by Plaintiff and the members of the Classes, as a result of the wrongs alleged herein in an amount to be determined at trial;

D.   Actual damages in an amount according to proof;

E.   Pre-judgment and post-judgment interest at the maximum rate permitted by applicable law;

F.   For an award of reasonable attorneys' fees and cost pursuant to R.I. Gen. Laws §§ 6-13.1-1, *et seq.*;

G.   For penalties as authorized by R.I. Gen. Laws §§ 6-13.1-1, *et seq.*;

H.   For costs and attorneys' fees under the common fund doctrine, and all other applicable law; and

I.   Such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of herself and the Class, hereby demands a trial by jury on all claims so triable.

Dated:  January 14, 2020                           Respectfully submitted,


                                                   /s/ Lauren A. Solar
                                                   Lauren Solar, RIBA 7231
                                                   Hackett Feinberg P.C.
                                                   155 Federal Street, 9th Floor
                                                   Boston, MA 02110
                                                   Tel. (617) 422-0200
                                                   las@bostonbusinesslaw.com

Jeffrey D. Kaliel (*pro hac vice* to be filed)
Sophia Gold (*pro hac vice* to be filed)
**KALIEL PLLC**
1875 Connecticut Ave., NW, 10th Floor
Washington, D.C. 20009
(202) 350-4783
jkaliel@kalielpllc.com
sgold@kalielpllc.com

Jeff Ostrow (*pro hac vice* to be filed)
Jonathan M. Streisfeld (*pro hac vice* to be filed)
Daniel Tropin (*pro hac vice* to be filed)
**KOPELOWITZ OSTROW FERGUSON
WEISELBERG GILBERT**
One W. Las Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Telephone No. (954) 525-4100
Facsimile No. (954) 525-4300
ostrow@kolawyers.com
streisfeld@kolawyers.com

*Attorneys for Plaintiff and the Putative Class*

# Exhibit A

Investments + Retirement (/ncuf/overview)

Charitable Foundation (https://ncufoundation.org/)

About Us (/about-us)

Community (/community)

Articles (/articles)

Help & Resources (/help-and-resources)

# Terms and Conditions of your Account

## TABLE OF CONTENTS

**TERMS AND CONDITIONS OF YOUR ACCOUNT**

Agreement

Bylaws

Amendments and Termination

Notices

Signature Card

Documentation, Identification and Information

Information Accuracy and Credit Verification

Change of Address

Correspondence

Your Instructions

Power of Attorney

Lost, Stolen or Destroyed Passbooks

Account Transfer

Closing Your Account

Indemnification of Navigant Credit Union

Liability

Deposits

Ownership of Account and Beneficiary Designation

Business Accounts

Deposits

Indorsing Checks

Withdrawals

Multi-Signature, Electronic Check Conversion and Similar Transactions

Stop Payments

Telephone Transfers

Transfer Limitations

Statements

Temporary Account Agreement

Restrictive Legends or Indorsements

Payment Order of Items

Death or Incompetence

Fiduciary Accounts

Legal Actions Affecting Your Account

Direct Deposits

Overdrafts/Insufficient Funds

Right to Repayment of Indebtedness

No Exemption from Set Off

Reimbursement for Losses

FEEDBACK (/FORM/WEBSITE-

Backup Withholding
Waiver of Notices
ACH and Wire Transfers
Unclaimed Property
UTMA Accounts
Unlawful Internet Gambling Notice
International ACH Transactions
Facsimile Signatures
Additional Information
**FUNDS AVAILABILITY DISCLOSURE**

# TERMS AND CONDITIONS
# OF YOUR ACCOUNT

**AGREEMENT -** This document, along with any other documents we give you pertaining to your accounts, is a contract that establishes rules which control your accounts with us. Please read this Agreement and the other documents carefully. If you sign the signature card or open or continue to have an account with us, you agree to these rules. You will receive a separate Consumer and/or Business Fees brochure simultaneously herewith at account opening. This brochure is commonly referred to herein as our fee schedule for services provided to you. This disclosure also contains information about rates and fees which may not be included in the Consumer and/or Business Fees brochure. If you have any questions, please call us.

This Agreement is subject to applicable federal laws and the laws of the State of Rhode Island (except to the extent that this Agreement can and does vary such rules or laws). The body of state and federal law that governs our relationship with you, however, is too large and complex to be reproduced here. The purpose of this document is to:

1. summarize some laws that apply to common transactions;
2. establish rules to cover transactions or events which the law does not regulate;
3. establish rules for certain transactions or events which the law regulates but permits variation by agreement; and
4. give you disclosures of some of our policies to which you may be entitled or in which you may be interested.

If there is a conflict between this Agreement and applicable law, despite anything in this Agreement that may state otherwise, this Agreement will be considered changed to the extent necessary to comply with the law. If any provision of this Agreement is deemed to be invalid, illegal or otherwise unenforceable in any respect by a court or other governmental agency having competent jurisdiction over us, that provision will continue to be enforceable to the extent permitted by that court or agency, and the remainder of that provision will no longer be considered part of this Agreement. All other provisions of this Agreement will, however, remain in full force and effect.

FEEDBACK (/FORM/WEBSITE-

No delay or waiver by us of any power, right, remedy or obligation under or in connection with this Agreement on any one occasion will constitute a waiver of that power, right, remedy or obligation on any subsequent occasion. In any event, no such waiver or delay by us will be effective unless it is in writing and signed and approved by us.

As used in this document the words "we," "our," and "us" mean Navigant Credit Union, and the words "you" and "your" mean each account owner and anyone else with the authority to deposit, withdraw, or exercise control over the funds in the account. The headings in this document are for convenience or reference only and will not govern the interpretation of the provisions. Unless it would be inconsistent to do so, words and phrases used in this document should be construed so the singular includes the plural and the plural includes the singular.

**BYLAWS -** Our bylaws establish basic rules about our credit union policies and operations which affect your account and membership. You may obtain a copy of the bylaws on request. Our right to require you to give us notice of your intention to withdraw funds from your account is described in the bylaws.

**AMENDMENTS AND TERMINATION -** We may change our bylaws and any term of this agreement. Rules governing changes in rates are provided separately in the Truth-in-Savings disclosure or in another document. For other changes we will give you reasonable notice in writing or by any other method permitted by law. We may close this account if your membership in the credit union terminates, or by giving reasonable notice to you and tender of the account balance personally or by mail. Items presented for payment after the account is closed may be dishonored. When you close your account, you are responsible for leaving enough money in the account to cover any outstanding items and charges to be paid from the account. Reasonable notice depends on the circumstances, and in some cases such as when we cannot verify your identity or we suspect fraud, it might be reasonable for us to give you notice after the change or account closure becomes effective. For instance, if we suspect fraudulent activity with respect to your account, we might immediately freeze or close your account and then give you notice. At our option, we may suspend your rights to member services if you violate the terms of this agreement. If we have notified you of a change in any term of your account and you continue to have your account after the effective date of the change, you have agreed to the new term(s).

**NOTICES -** Any written notice you give us is effective when we actually receive it, and it must be given to us according to the specific delivery instructions provided elsewhere, if any. We must receive it in time to have a reasonable opportunity to act on it. If the notice is regarding a check or other item, you must give us sufficient information to be able to identify the check or item, including the precise check or item number, amount, date and payee. Written notice we give you is effective when it is deposited in the United States Mail with proper postage and addressed to your mailing address we have on file. Notice to any of you is notice to all of you.

FEEDBACK
(/FORM/WEBSITE-

Terms and Conditions of your Account | Navigant Credit Union                Page 4 of 24

**SIGNATURE CARD -** The form of ownership of your account is designated on the signature card you completed when opening your account. We may rely on this designation for all purposes concerning your account. If for some reason you have not signed a signature card or we do not have your signature card, we will not be liable to you for honoring checks or other signed instructions if we believe in good faith that the signature appearing on such checks or instructions is authorized.

If two or more persons desire to establish a joint account with us, each person must sign the signature card. For your convenience, we may allow you to establish a joint account, even if only one joint account owner signs the signature card. If we allow you to do this, you agree to indemnify and hold us harmless from and against any Losses (as defined below) we may incur, or other harm arising from, or in any way relating to, establishing your joint account without having a signature card signed by another joint account owner. When we use the word "Losses" in this Agreement, we mean all losses, liabilities, claims, fines, penalties, fees, costs and expenses (including, without limitation, attorneys' fees and litigation costs) of any kind. Each account owner who has not signed the account's signature card shall be bound by this Agreement and any other applicable agreement. If any joint account owner has not provided us with a signed signature card, your joint account may not qualify as a joint account for purposes of federal deposit insurance coverage or under applicable law concerning inheritance or the transfer of property upon death. We reserve the right to refuse to pay or honor checks and other orders of withdrawal signed by a joint account owner who has not signed the account's signature card. We may, in our sole discretion, convert your joint account into an individual account.

**DOCUMENTATION, IDENTIFICATION AND INFORMATION -** To help the government fight the funding of terrorism and money laundering activities, applicable law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account. Accordingly, you may establish an account with us by signing our signature card and providing us with any other documentation (for example, your name, address, date of birth, license information, etc.) that we may require from time to time. If you desire to establish a joint account with us, each joint account owner must sign our signature card and provide us with any other documentation or information that we may require from time to time. To avoid possible fraud or other problems with your account, all documentation you provide to us in connection with establishing your account must be in form and substance satisfactory to us.

We reserve the right to approve any and all documentation, such as checks or other items you use with your account.

You agree that (a) we are not liable to you and (b) you will indemnify and hold us harmless from and against any and all Losses of any kind that we may incur resulting from your use of checks obtained from a third-party vendor and not through us or if you print your own checks. When we use the word *"check"* in this Agreement, we mean checks or other items, such as drafts or electronic images presented to us for payment by another financial institution.

FEEDBACK
(/FORM/WEBSITE-

We may from time to time request additional information from you to protect your account and our systems from fraud or other problems. This information may include new specimen signatures and other information that we must obtain under applicable law. You agree to assist us by promptly complying with any such request. You also agree to hold us harmless for refusing to pay or release funds or to take any other action relating to your account where the refusal is based on your failure to provide the signatures or documentation requested by us from time to time.

**INFORMATION ACCURACY AND CREDIT VERIFICATION -** You acknowledge and agree that any information you have or will provide to us is complete, true and accurate. You authorize us to request and obtain, from time to time, consumer reports from consumer reporting agencies or other information about you from third parties (including, without limitation, information concerning your employment, salary, assets, debts and references) that we believe is helpful to determine your eligibility to open or maintain any accounts or services or for any other legitimate business purpose.

**CHANGE OF ADDRESS -** You agree to notify us in writing if you change your address. We will rely on your address as it appears on our records for any and all communications we send to you unless you notify us in writing of a change of address to our corporate headquarters, Navigant Credit Union, 1005 Douglas Pike, Smithfield, Rhode Island 02917, and we have had a reasonable opportunity to act on such notice. Change of address can also be performed online.

**CORRESPONDENCE -** To the extent permitted under applicable law, any written correspondence you send to us will not be effective until we have received it and have had a reasonable opportunity to act on such correspondence. Any written correspondence we send to you will, however, be effective and deemed delivered when mailed to you at your address as it appears on our records. If your account is a joint account, any correspondence that we send to any one joint account owner at the address on our records for the joint account is considered notice to all joint account owners.

If you have agreed to receive information or documents from us electronically (Electronic Records), the Electronic Records are sent by us, and received by you, when either (a) the Electronic Records are transmitted by us to an email address you have given us for that purpose, or (b) the Electronic Records are posted to a website and an email is transmitted by us to an email address you have given us for that purpose notifying you that the Electronic Records are available for access. If you have agreed to receive information or documents from us electronically, you will notify us immediately if your email address changes or you cancel your email service. Until you give us notice, we may continue to send Electronic Records to your email address we have on file.

FEEDBACK (/FORM/WEBSITE-

Terms and Conditions of your Account | Navigant Credit Union

**YOUR INSTRUCTIONS –** In our sole discretion, we may follow your instructions concerning your account, whether such instructions are provided by you in writing, electronically, orally (including our recording of your oral instructions) or by other means, and we may do so without any liability to you.

**POWER OF ATTORNEY –** We may, in our sole discretion, permit any person to whom you have granted a power of attorney to access and otherwise transact business on your account until such time as we receive and have had a reasonable opportunity to act on written notice that the power of attorney has been revoked. You agree to provide us with documentation that is in a form satisfactory to us unless applicable law provides otherwise, and to hold us harmless from and against any actions we have taken or your attorney-in-fact has taken regarding your account prior to the revocation of such power. Subject to applicable law, we may, in our sole discretion, refuse to honor any power of attorney. We have no duty to monitor or ensure that the acts of any attorney-in-fact exceeds his or her powers or does not comply with applicable law.

**LOST, STOLEN OR DESTROYED PASSBOOKS –** You agree to notify us as soon as possible if any passbook issued in connection with your account is lost, stolen or destroyed. We will close your account and issue you a replacement passbook only if you (or, if your account is a joint account, all joint account owners) make a written application to us, present us with appropriate identification and other documentation that we deem appropriate under the circumstances, and pay us a loss passbook fee as set forth in our fee schedule (as the same may be amended from time to time). We will have no further liability for the original passbook upon the issuance of a replacement passbook, and you agree to indemnify us for all Losses arising from the issuance of a new passbook to you.

**ACCOUNT TRANSFER –** Your account may not be transferred or assigned without our prior written consent.

**CLOSING YOUR ACCOUNT –** We may close your account at any time and for any reason in our sole discretion, and we will provide notice to you of such closing. You may also close your account at any time by calling us or by visiting any of our branch offices. Any request to close your account will be effective only after we have received your request and we have had a reasonable opportunity to act on such request and the validity of the same. If your account is closed, we may, in our sole discretion, mail to you at your address as it appears on our records our check representing the remaining balance in your account, if any, or transfer such balance to another account you maintain with us. In any event, we will not be liable to you for dishonoring any item drawn on or debited from your account and presented to us for payment after your account has been closed. The closing of your account, whether by us or you, will not affect any of your or our rights and obligations which have arisen before the effective date of the closing of your account, and this Agreement will survive the closing of your account. In this regard, after your account is closed, you are still responsible for the payment of any fees or charges incurred prior to or in connection with the closing of your account.

FEEDBACK (/FORM/WEBSITE-

**INDEMNIFICATION OF NAVIGANT CREDIT UNION -** You agree to indemnify and hold us, our directors, officers, employees, and agents harmless from and against Losses arising in connection with the services provided under this Agreement, except for Losses arising out of our own gross negligence or willful misconduct. You further agree to indemnify and hold us, our directors, officers, employees and agents harmless from Losses arising out of actions taken or omitted in good faith by us in reliance upon instructions from you. We are not responsible for any actions or omissions by any third party. If you give us instructions that we believe may expose us to potential liability, we may refuse to follow your instructions. We are under no obligation to follow, and we will not be liable to you if we choose not to follow, such instructions. If we do, we may ask you for certain protections such as a surety bond or an indemnity agreement in a form that is satisfactory to us.

**LIABILITY -** You agree, for yourself (and the person or entity you represent if you sign as a representative of another) to the terms of this account and the schedule of charges. You authorize us to deduct these charges, without notice to you, directly from the account balance as accrued. You will pay any additional reasonable charges for services you request which are not covered by this agreement.

Each of you also agrees to be jointly and severally (individually) liable for any account shortage resulting from charges or overdrafts, whether caused by you or another with access to this account. This liability is due immediately, and can be deducted directly from the account balance whenever sufficient funds are available. You have no right to defer payment of this liability, and you are liable regardless of whether you signed the item or benefited from the charge or overdraft.

You will be liable for our costs as well as for our reasonable attorneys' fees, to the extent permitted by law, whether incurred as a result of collection or in any other dispute involving your account. This includes, but is not limited to, disputes between you and another joint owner; you and an authorized signer or similar party; or a third party claiming an interest in your account. This also includes any action that you or a third party takes regarding the account that causes us, in good faith, to seek the advice of an attorney, whether or not we become involved in the dispute. All costs and attorneys' fees can be deducted from your account when they are incurred, without notice to you.

**DEPOSITS -** We will give only provisional credit until collection is final for any items, other than cash, we accept for deposit (including items drawn "on us"). Before settlement of any item becomes final, we act only as your agent, regardless of the form of indorsement or lack of indorsement on the item and even though we provide you provisional credit for the item. We may reverse any provisional credit for items that are lost, stolen, or returned. Unless prohibited by law, we also reserve the right to charge back to your account the amount of any item deposited to your account or cashed for you which was initially paid by the payor bank and which is later returned to us due to an allegedly forged, unauthorized or missing indorsement, claim of alteration, encoding error or other problem which in our judgment justifies reversal of credit. You authorize us to attempt to collect previously returned items without giving you notice, and in

FEEDBACK
(/FORM/WEBSITE-

attempting to collect we may permit the payor bank to hold an item beyond the midnight deadline. Actual credit for deposits of, or payable in, foreign currency will be at the exchange rate in effect on final collection in U.S. dollars. We are not responsible for transactions by mail or outside depository until we actually record them. If you deliver a deposit to us and you will not be present when the deposit is counted, you must provide us an itemized list of the deposit (deposit slip). To process the deposit, we will verify and record the deposit, and credit the deposit to the account. If there are any discrepancies between the amounts shown on the itemized list of the deposit and the amount we determine to be the actual deposit, we will notify you of the discrepancy. You will be entitled to credit only for the actual deposit as determined by us, regardless of what is stated on the itemized deposit slip. We will treat and record all transactions received after our "daily cutoff time" on a business day we are open, or received on a day we are not open for business, as if initiated on the next business day that we are open. At our option, we may take an item for collection rather than for deposit. If we accept a third-party check for deposit, we may require any third-party indorsers to verify or guarantee their indorsements, or indorse in our presence.

**OWNERSHIP OF ACCOUNT AND BENEFICIARY DESIGNATION -** These rules apply to this account depending on the form of ownership and beneficiary designation, if any, specified on the account records. We reserve the right to refuse some forms of ownership on any or all of our accounts. We make no representations as to the appropriateness of or the effect of the ownership and beneficiary designations, except as they determine to whom we pay the account funds. You agree that your accounts will only be used for personal financial transactions, and that the accounts will not be used for transactions related to a business, sole proprietorship, corporation or any other business entity unless you provide us with appropriate evidence of the existence, and your authority to act on behalf, of such business entity. We reserve the right to have legal counsel, at any time, review all aspects of any account agreement.

**Individual Account:** An individual account is an account in the name of one person. If you establish an individual account, you are the sole owner of the account.

**Joint Account:** If you have a joint account, each person will be a co-owner and authorized signer and will have equal authority and rights regarding the account.

**Deposits, Withdrawals and Other Account Transactions:** Any money deposited into your joint account is the property of each joint account owner. At our discretion, we may (i) permit any joint account owner to withdraw all or any part of the deposits to, and interest earned on, your joint account, (ii) pay checks drawn on your joint account by any joint account owner, or (iii) honor any other request of any joint account owner relating to your joint account, even if we do not have on record a signature card signed by the joint account owner who signed the check or is seeking to withdraw or to take any other action on your joint account. We may, however, also refuse to do so.

FEEDBACK (/FORM/WEBSITE-

Terms and Conditions of your Account | Navigant Credit Union

We may follow instructions about your joint account from any owner of the joint account, and may do so without any notice or liability to the other joint account owners. In the event that there is a dispute or a joint account owner provides us with conflicting instructions, we may place a hold on, and refuse to pay checks, permit withdrawals from, or permit other transactions on your joint account until we receive a final court order or written instructions signed by all joint account owners. Once your joint account is opened, a joint account owner cannot add or remove another joint account owner from that joint account without the prior written consent of all other joint owners. Any joint account owner can close the joint account by withdrawing all of the funds from the joint account.

**Right of Survivorship (and Not as Tenants in Common):** We presume that any joint account established with us is a joint tenancy with right of survivorship, subject to applicable law, and not a tenancy in common. Generally speaking, this means that, upon the death of any joint account owner, the account balance is owned by the surviving joint account owners, subject to our right of set off and any applicable security interest, and the heirs of the deceased joint account owner have no interest in the account. We may, however, require the surviving joint account owners to provide us with certain documentation satisfactory to us before we will release the remaining funds in the account. If more than one joint account owner survives, they will own the account as joint tenants with right of survivorship, not as tenants in common.

**Payable On Death Accounts:** Without having to establish a trust, you may, subject to applicable law, designate your account to be payable on your death to one or more designated beneficiaries - known as a Payable on Death Account. This is similar to a ***Totten Trust Account*** described below. If you establish a Payable on Death Account, the account belongs to you during your lifetime and your beneficiaries have no interest in or any access to the account until your death. Upon your death (or in the case of a joint account, upon the death of the last-surviving joint account owner), all of the funds in the Payable on Death Account will be owned by the beneficiary (or if there is more than one designated beneficiary, in equal shares by the beneficiaries then living). The funds in your Payable on Death Account are not governed by your will or inherited by your heirs. If there is more than one beneficiary, in our sole discretion and subject to our right of set off and any applicable security interest, we may pay the funds in a Payable on Death Account in equal shares to the account's living beneficiaries or pay the funds by issuing a check in the name of all living beneficiaries and giving the check to any one beneficiary. We have no obligation to notify any beneficiary of the existence of a Payable on Death Account or the vesting of an interest in such an account. Certain state law restrictions may apply to Payable on Death Accounts. You are solely responsible for complying with applicable law in establishing a Payable on Death Account. We make no representation that designating your account as a Payable on Death Account is advisable. You should consult an attorney or other qualified estate planning professional before designating your account as a Payable on Death Account.

**Totten Trust Account:** In limited circumstances, we may, in our sole discretion, allow you to establish a Totten Trust account without a formal trust document, provided you give us the name and residential address of the account beneficiaries and any other documentation we may require in a form satisfactory to us. Generally speaking, a Totten Trust is an account established by you in your own name as the trustee for the benefit of another, and is a tentative trust revocable at will. This means you may withdraw all of the funds in the account for your own use at any time. If there is more than one trustee named on the account, the account will be treated as a joint account and all of the rules regarding joint accounts will apply, except as set forth herein. Deposits made to your Totten Trust account will be credited to you as trustee for the benefit of the designated account beneficiary or beneficiaries. We may make payments to you during your lifetime. Upon your death, or if there is more than one trustee, upon the death of the last surviving trustee, all of the funds will be owned by the beneficiary (or if there is more than one designated beneficiary, in equal shares by the beneficiaries then living). Subject to our right of set off and any applicable security interest, if there is more than one living beneficiary, we may, at our option, pay the funds in the account in equal shares to each beneficiary or pay the funds by issuing a check in the name of both beneficiaries and giving the check to any one beneficiary. The money in the account will not be inherited by your heirs or controlled by your will. Certain state law restrictions may apply. You are solely responsible for complying with applicable law in establishing a Totten Trust account. We have no obligation to notify any beneficiary of the existence of any account or the vesting of any interest in any account.

**Formal Trust Accounts:** We may, in our sole discretion, allow a trustee or the trustees of a formal written trust (other than a Totten Trust) to establish an account with us in the name of the trust. In the case of any such trust account, you agree to provide us with a copy of the trust instrument, the name and residential address of any successor trustee designated in the trust instrument, and any other documentation in a form satisfactory to us, including a certificate of trust, and to hold us harmless from and against any actions that we take or any trustee takes regarding the account in reliance on such documentation or certification. We have no duty to monitor or ensure that the acts of any trustee are for the use or benefit of the beneficiaries or are otherwise permissible under any trust instrument or applicable law. We will not be liable if any trustee exceeds his or her powers or does not comply with applicable law.

**BUSINESS ACCOUNTS -** Earnings in the form of interest, dividends, or credits will be paid only on collected funds, unless otherwise provided by law or our policy. We may require the governing body of the legal entity opening the account to give us a separate authorization telling us who is authorized to act on its behalf. We will honor the authorization until we actually receive written notice of a change from the governing body of the legal entity.

**DEPOSITS -** We will give only provisional credit until collection is final for any items, other than cash, that we accept for deposit (including items drawn "on us"). Actual credit for deposits of, or payable in, foreign currency will be at the exchange rate in effect on final collection in U.S. dollars. We

FEEDBACK
(/FORM/WEBSITE-

are not responsible for transactions by mail or outside depository until we actually record them. We will treat and record all transactions received after our "daily cutoff time" on a business day we are open, or received on a day we are not open for business, as if initiated on the next following business day that we are open.

**INDORSING CHECKS -** If you cash or deposit a check, we are legally entitled to a valid and unqualified indorsement from you, and you give us the irrevocable right to place such an indorsement on the check. You agree to reimburse us for our Losses because you fail to indorse a check as exactly drawn or you deposit a check that contains multiple indorsements or a missing or improper indorsement. You also agree not to give us any check which you have indorsed "without recourse" or with another similar condition. If you do, we can still place your unqualified indorsement on the check. We can enforce against you any rights that an unqualified indorsement gives us. Unless otherwise required by applicable law, we will not be bound by or obligated to comply with any notation or memoranda on a check unless we have agreed to do so in advance and in writing.

**WITHDRAWALS -**

**Generally -** Unless clearly indicated otherwise on the account records, any of you, acting alone, who signs to open the account or has authority to make withdrawals may withdraw or transfer all or any part of the account balance at any time. Each of you (until we receive written notice to the contrary) authorizes each other person who signs or has authority to make withdrawals to indorse any item payable to you or your order for deposit to this account or any other transaction with us.

**Postdated checks -** A postdated check is one which bears a date later than the date on which the check is written. We may properly pay and charge your account for a postdated check even though payment was made before the date of the check, unless we have received written notice of the postdating in time to have a reasonable opportunity to act. Because we process checks mechanically, your notice will not be effective and we will not be liable for failing to honor your notice unless it precisely identifies the number, date, amount and payee of the item.

**Checks and withdrawal rules -** If you do not purchase your check blanks from us, you must be certain that we approve the check blanks you purchase. We may refuse any withdrawal or transfer request which you attempt on forms not approved by us or by any method we do not specifically permit. We may refuse any withdrawal or transfer request which is greater in number than the frequency permitted, or which is for an amount greater or less than any withdrawal limitations. We will use the date the transaction is completed by us (as opposed to the date you initiate it) to apply the frequency limitations. In addition, we may place limitations on the account until your identity is verified.

Even if we honor a nonconforming request, we are not required to do so later. If you violate the stated transaction limitations (if any), in our discretion we may close your account or reclassify it as a transaction account. If we reclassify your account, your account will be subject to the fees and earnings rules of the new account classification.

If we are presented with an item drawn against your account that would be a "substitute check," as defined by law, but for an error or defect in the item introduced in the substitute check creation process, you agree that we may pay such item.

See the funds availability policy disclosure for information about when you can withdraw funds you deposit. For those accounts to which our funds availability policy disclosure does not apply, you can ask us when you make a deposit when those funds will be available for withdrawal. An item may be returned after the funds from the deposit of that item are made available for withdrawal. In that case, we will reverse the credit of the item. We may determine the amount of available funds in your account for the purpose of deciding whether to return an item for insufficient funds at any time between the time we receive the item and when we return the item or send a notice in lieu of return. We need only make one determination, but if we choose to make a subsequent determination, the account balance at the subsequent time will determine whether there are insufficient available funds.

**A temporary debit authorization hold affects your account balance -** On debit card purchases, merchants may request a temporary hold on your account for a specified sum of money, which may be more than the actual amount of your purchase. When this happens, our processing system cannot determine that the amount of the hold exceeds the actual amount of your purchase. This temporary hold, and the amount charged to your account, will eventually be adjusted to the actual amount of your purchase, but it may be up to three days before the adjustment is made. Until the adjustment is made, the amount of funds in your account available for other transactions will be reduced by the amount of the temporary hold. If another transaction is presented for payment in an amount greater than the funds left after the deduction of the temporary hold amount, that transaction will be an insufficient funds (NSF) transaction if we do not pay it or an overdraft transaction if we do pay it. You will be charged an NSF or overdraft fee according to our NSF or overdraft fee policy. You will be charged the fee even if you would have had sufficient funds in your account if the amount of the hold had been equal to the amount of your purchase.

Here is an example of how this can occur – assume for this example the following: (1) you have opted-in to our overdraft privilege services for the payment of overdrafts on ATM and everyday debit card transactions, (2) we pay the overdraft. A separate disclosure containing specific terms and conditions about our overdraft protection plans and overdraft fees is available upon request.

You have $120 in your account. You swipe your card at the card reader on a gasoline pump. Since it is unclear what the final bill will be, the gas station's processing system immediately requests a hold on your account in a specified amount, for example, $80. Our processing system authorizes a temporary hold on your account in the amount of $80, and the gas station's processing system authorizes you to begin pumping gas. You fill your tank and the amount of gasoline you purchased is only $50. Our processing system shows that you have $40 in your account available for other transactions ($120 - $80 = $40) even though you would have $70 in your account available for other transactions if the amount of the

FEEDBACK
(/FORM/WEBSITE-

temporary hold was equal to the amount of your purchase ($120 - $50 = $70). Later, another transaction you have authorized is presented for payment from your account in the amount of $60 (this could be a check you have written, another debit card transaction, an ACH debit or any other kind of payment request). This other transaction is presented before the amount of the temporary hold is adjusted to the amount of your purchase (remember, it may take up to three days for the adjustment to be made). Because the amount of this other transaction is greater than the amount our processing system shows is available in your account, our payment of this transaction will result in an overdraft transaction. Because the transaction overdraws your account by $20, your account will be assessed an overdraft fee according to our overdraft fee policy. You will be charged this fee according to our policy even though you would have had enough money in your account to cover the $60 transaction if your account had only been debited the amount of your purchase rather than the amount of the temporary hold or if the temporary hold had already been adjusted to the actual amount of your purchase.

**Overdrafts -** You can ask us if we have other account services that might be available to you where we commit to paying overdrafts under certain circumstances, such as an overdraft protection loan (i.e. Overdraft Line of Credit, Cash Reserve Line of Credit or Personal Line of Credit) to transfer funds from another account you have with us. You agree that we may charge fees for overdrafts. For consumer accounts, we will not charge fees for overdrafts caused by ATM withdrawals or one-time debit card transactions if you have not opted-in to that service. For passbook accounts, we may refuse any withdrawal should you not possess the account passbook at the time of request for withdrawal. Please also refer to the **FUNDS AVAILABILITY DISCLOSURE** section in this document. For those accounts for which our funds availability policy disclosure does not apply, you can ask us when you make a deposit when those funds will be available for withdrawal.

We may also refuse your request to make a withdrawal from your account under certain circumstances, including, without limitation, where:

- we have received a court order or other legal document prohibiting withdrawal or if applicable law prohibits withdrawal;
- there is a dispute concerning your account;
- you owe us money that is due and payable;
- your account is security for a debt;
- you or a person we believe to be an agent of an owner of your account requests that we do not permit withdrawals;
- a problem occurs with our equipment;
- limited currency is available at a particular branch office; or
- such action is otherwise required by applicable law.

We are required by applicable law to reserve the right to require at least seven (7) calendar days' written notice before you withdraw money from your interest-bearing checking, savings, money market, Variable Rate Savings IRA or SEP accounts. If, on our request, you do not provide us with such written notice, we may refuse to allow you to withdraw funds from your account, whether by check or other means, during this period, and we will not be liable to you for this refusal. Variable Rate Savings IRA and SEP

FEEDBACK (/FORM/WEBSITE-

account withdrawals are subject to current regulations of the Internal Revenue Service (IRS) governing such accounts and may trigger tax penalties and be subject to taxation.

**Passbook Savings Accounts:** You must make all withdrawals and transfers from your passbook savings account in person at one of our branches that accepts passbook accounts. You must have your passbook with you and it must be presented at the time of the withdrawal transaction. Electronic Fund Transfers are not permitted on Passbook Share accounts. This includes but is not limited to any direct deposits, pre-authorized transfers or arrangements to pay recurring bills.

**Club Statement Accounts:** You are not able to make withdrawals or transfers from your club statement account until the end of its term. You may close your club statement account at any time; however, you may be charged a fee as set forth in our fee schedule (as the same may be amended from time to time) if any withdrawal is made from your club statement account before the end of its term.

**IRAs and SEP Accounts:** All withdrawals from your IRA and SEP accounts are subject to current regulations of the IRS governing such accounts and may trigger tax penalties and be subject to taxation. You can withdraw interest credited to your CD account before the maturity of the term of your CD without penalty. There may be a fee for outgoing transfers from an IRA or SEP account as set forth in our fee schedule (as the same may be amended from time to time). You should refer to all of your retirement and account disclosure statements for other retirement account limitations.

**MULTI-SIGNATURE, ELECTRONIC CHECK CONVERSION AND SIMILAR TRANSACTIONS -** An electronic check conversion transaction is a transaction where a check or similar item is converted into an electronic fund transfer as defined in the Electronic Fund Transfers regulation. In these types of transactions the check or similar item is either removed from circulation (truncated) or given back to you. As a result, we have no opportunity to review the check to examine the signatures on the item. You agree that, as to these or any items as to which we have no opportunity to examine the signatures, you waive any requirement of multiple signatures.

Online banking and telephone banking transactions, including but not limited to transfers and bill payments, will not be permitted and processed on any consumer or business deposit account that has a multi-signature requirement. The multi-signature requirement will also not apply to debit card transactions, however debit card transactions will be permitted and processed but with a single authorization. The multi-signature requirement is for the sole benefit, use and privilege of the consumer or business deposit account owners and shall not be binding on us. All account owners and/or authorized signers indemnify and hold harmless Navigant Credit Union from and against any and all claims and/or demands with regard to the terms and conditions contained herein in this paragraph.

FEEDBACK (/FORM/WEBSITE-

**STOP PAYMENTS -** You must make any stop-payment order in the manner required by law and we must receive it in time to give us a reasonable opportunity to act on it before our stop-payment deadline time. To be effective, your stop-payment order must precisely identify the number, date and amount of the item, and the payee.

You may stop payment on any item drawn on your account, including preauthorized recurring payments, whether you sign the item or not, if you have an equal or greater right to withdraw from this account than the person who signed the item. A release of the stop-payment request may be made only by the person who initiated the stop-payment order. Stop-payments must be received one hour after the opening of the next banking day after the banking day on which we receive the item. Stop-payments received after such time are not effective and will not be honored. Additional limitations on our obligation to stop payment are provided by law (e.g., if we paid the item in cash or we certified the item).

**TELEPHONE TRANSFERS -** A telephone transfer of funds from your account to another account with us, if otherwise arranged for or permitted, may be made by the same persons and under the same conditions generally applicable to withdrawals made in writing. Unless a different limitation is disclosed in writing, we restrict the number of transfers from a savings account to another account or to third parties, to a maximum of six per month (less the number of "preauthorized transfers" during the month). Other account transfer restrictions may be described elsewhere.

**TRANSFER LIMITATIONS -** For savings and money market accounts you may make up to six (6) transfers or withdrawals by means of a preauthorized, automatic, or telephonic transfer to another account of yours or to a third party during any calendar month (or statement cycle of at least four weeks). A preauthorized transfer includes any arrangement with us to pay a third party from your account at (i) a predetermined time; (ii) on a fixed schedule or (iii) upon oral or written orders including orders received through the automated clearing house (ACH). If the transfer or withdrawal is initiated in person, by mail, or at an ATM then there is no limit on the number of payments that may be made directly to you, directly to us for amounts you owe us, or transfers to other accounts you have with us. Withdrawals by phone are also unlimited if you are requesting that a check be mailed to you.

**STATEMENTS - Your duty to report unauthorized signatures, alterations and forgeries -** You must examine your statement of account with "reasonable promptness." If you discover (or reasonably should have discovered) any unauthorized signatures or alterations, you must promptly notify us of the relevant facts. As between you and us, if you fail to do either of these duties, you will have to either share the loss with us, or bear the loss entirely yourself (depending on whether we used ordinary care and, if not, whether we substantially contributed to the loss). The loss could be not only with respect to items on the statement but other items with unauthorized signatures or alterations by the same wrongdoer.

You agree that the time you have to examine your statement and report to us will depend on the circumstances, but will not, in any circumstance, exceed a total of thirty (30) days from when the statement is first sent or made available to you.

You further agree that if you fail to report any unauthorized signatures, alterations or forgeries in your account within sixty (60) days of when we first send or make the statement available, you cannot assert a claim against us on any items in that statement, and as between you and us the loss will be entirely yours. This sixty (60)-day limitation is without regard to whether we used ordinary care. The limitation in this paragraph is in addition to that contained in the first paragraph of this section.

**Your duty to report other errors -** In addition to your duty to review your statements for unauthorized signatures, alterations and forgeries, you agree to examine your statement with reasonable promptness for any other error - such as an encoding error. In addition, if you receive or we make available either your items or images of your items, you must examine them for any unauthorized or missing indorsements or any other problems. You agree that the time you have to examine your statement and items and report to us will depend on the circumstances. However, this time period shall not exceed sixty (60) days. Failure to examine your statement and items and report any errors to us within sixty (60) days of when we first send or make the statement available precludes you from asserting a claim against us for any errors on items identified in that statement and as between you and us the loss will be entirely yours.

**TEMPORARY ACCOUNT AGREEMENT -** If the account documentation indicates that this is a temporary account agreement, it means that all account owners have not yet signed the signature card, or that some other account opening requirement has not been completed. We may give you a duplicate signature card so that you can obtain all of the necessary signatures and return it to us. Each person who signs to open the account or has authority to make withdrawals (except as indicated to the contrary) may transact business on this account. However, we may at some time in the future restrict or prohibit further use of this account if you fail to comply with the requirements we have imposed within a reasonable time.

**RESTRICTIVE LEGENDS OR INDORSEMENTS -** We are not required to honor any restrictive legend or restrictive indorsement on checks you write unless we have agreed in writing to the restriction. Examples of restrictive legends are "must be presented within ninety (90) days" or "not valid for more than $1,000.00." The payee's signature accompanied by the words "for deposit only" is an example of a restrictive indorsement.

**PAYMENT ORDER OF ITEMS -** The order in which items are paid is important if there is not enough money in your account to pay all of the items that are presented. The payment order can affect the number of items overdrawn or returned unpaid and the amount of the fees you may have to pay. To assist you in managing your account, we are providing you with the following information regarding how we process those items.

Our policy is to process credits (or deposits into your account) in the order they are received on the day they are processed. We process debits (or withdrawals out of your account) lowest to highest dollar amount on the

FEEDBACK (/FORM/WEBSITE-

day they are processed. We process ATM and debit card transactions in the order they are received on the day they are processed. We process checks lowest to highest dollar amount on the day they are processed. We process checks cashed at branch, levies, garnishments, items not initially paid due to NSF in the order they are received on the day they are processed. We process any fees on your account for services posted in an order generated by our system.

*NOTE - There are exceptions to the above items based on manual processing.

If a check, item or transaction is presented without sufficient funds in your account to pay it, we may, at our discretion, pay the item (creating an overdraft) or return the item for insufficient funds (NSF). We will not charge you a fee for paying an overdraft of an ATM or everyday debit card transaction if this is a consumer account and you have not opted-in to that service. The amounts of the overdraft and NSF fees are disclosed elsewhere, as are your rights to opt in to overdraft services for ATM and everyday debit card transactions, if applicable. We encourage you to make careful records and practice good account management. This will help you to avoid creating items without sufficient funds and potentially incurring the resulting fees.

**DEATH OR INCOMPETENCE -** You agree to notify us promptly if any person with a right to withdraw funds from your account(s) dies or is adjudicated (determined by the appropriate official) incompetent. We may continue to honor your checks, items, and instructions until: (a) we know of your death or adjudication of incompetence, and (b) we have had a reasonable opportunity to act on that knowledge. You agree that we may pay or certify checks drawn on or before the date of death or adjudication of incompetence for up to ten (10) days after your death or adjudication of incompetence unless ordered to stop payment by someone claiming an interest in the account.

**FIDUCIARY ACCOUNTS -** Accounts may be opened by a person acting in a fiduciary capacity. A fiduciary is someone who is appointed to act on behalf of and for the benefit of another. We are not responsible for the actions of a fiduciary, including the misuse of funds. This account may be opened and maintained by a person or persons named as a trustee under a written trust agreement, or as executors, administrators, or conservators under court orders. You understand that by merely opening such an account, we are not acting in the capacity of a trustee in connection with the trust nor do we undertake any obligation to monitor or enforce the terms of the trust or letters.

**LEGAL ACTIONS AFFECTING YOUR ACCOUNT -** If we are served with a subpoena, restraining order, writ of attachment or execution, levy, garnishment, search warrant, or similar order relating to your account (termed "legal action" in this section), we will comply with that legal action. Or, in our discretion, we may freeze the assets in the account and not allow any payments out of the account until a final court determination regarding the legal action. We may do these things even if the legal action involves less than all of you. In these cases, we will not have any liability to you if there are insufficient funds to pay your items because we have

FEEDBACK
(/FORM/WEBSITE-

withdrawn funds from your account or in any way restricted access to your funds in accordance with the legal action. Any fees or expenses we incur in responding to any legal action (including, without limitation, attorneys' fees and our internal expenses) may be charged against your account. The list of fees applicable to your account(s) provided elsewhere may specify additional fees that we may charge for certain legal actions.

**DIRECT DEPOSITS -** If, in connection with a direct deposit plan, we deposit any amount in an account which should have been returned to the Federal Government for any reason, you authorize us to deduct the amount of our liability to the Federal Government from the account or from any other account you have with us, without prior notice and at any time, except as prohibited by law. We may also use any other legal remedy to recover the amount of our liability.

**OVERDRAFTS/INSUFFICIENT FUNDS -** We determine from time to time during each business day whether or not your account contains sufficient available funds to pay a transaction (i.e., a check, in-person withdrawal, ATM withdrawal, point-of-sale transaction, or any other paper or electronic transaction). You agree to deposit sufficient funds to cover any overdrafts and related overdraft/insufficient available funds fees immediately, and you agree that any overdrafts and related overdraft/insufficient available funds fees may be repaid out of any subsequent deposit to your account or set off against such deposit, including, without limitation, deposits of Social Security, Supplemental Security Income or other government benefits. You also agree to reimburse us for any Losses we incur in collecting any overdrafts from you. We are under no obligation to permit overdrafts. Our honoring of one or more overdrafts does not obligate us to honor any future overdrafts, and you should not rely on us to honor an overdraft even if we have done so in the past. If, however, your account has an overdraft line of credit, transactions that would create an overdraft on your account may be honored in accordance with our overdraft line of credit agreement with you.

A separate disclosure containing specific terms and conditions about our overdraft protection plans and overdraft fees is available upon request.

**RIGHT TO REPAYMENT OF INDEBTEDNESS -** You each agree that we may (without prior notice and when permitted by law) charge against and deduct from this account any due and payable debt any of you owe us now or in the future. If this account is owned by one or more of you as individuals, we may set off any funds in the account against a due and payable debt a partnership owes us now or in the future, to the extent of your liability as a partner for the partnership debt. If your debt arises from a promissory note, then the amount of the due and payable debt will be the full amount we have demanded, as entitled under the terms of the note, and this amount may include any portion of the balance for which we have properly accelerated the due date.

In addition to these contract rights, we may also have rights under a "statutory lien." A "lien" on property is a creditor's right to obtain ownership of the property in the event a debtor defaults on a debt. A "statutory lien" is one created by federal or state statute. If federal or state

FEEDBACK (/FORM/WEBSITE-

law provides us with a statutory lien, then we are authorized to apply, without prior notice, your shares and dividends to any debt you owe us, in accord with the statutory lien.

Neither our contract rights nor rights under a statutory lien apply to this account if prohibited by law. For example, neither our contract rights nor rights under a statutory lien apply to this account if: (a) it is an Individual Retirement Account or similar tax-deferred account, or (b) the debt is created by a consumer credit transaction under a credit card plan (but this does not affect our rights under any consensual security interest), or (c) the debtor's right of withdrawal arises only in a representative capacity, or (d) setoff is prohibited by the Military Lending Act or its implementing regulations. We will not be liable for the dishonor of any check or draft when the dishonor occurs because we charge and deduct an amount you owe us from your account. You agree to hold us harmless from any claim arising as a result of our exercise of our right to repayment.

**NO EXEMPTION FROM SET OFF -** If any funds in your account are exempt from execution, levy, attachment, garnishment, seizure, set off or other equitable process (including but not limitation, any Social Security, Supplemental Security Income, veterans or other federal or state benefits), as between you and us, you agree to waive such exemption to the extent permitted by law.

**REIMBURSEMENT FOR LOSSES -** If we take any action to collect your debt or other amounts you owe us under this Agreement or defend ourselves in a lawsuit brought by you where we are the prevailing party, you agree to reimburse us for our Losses, to the extent permitted by applicable law. We may charge your account for our Losses without prior notice to you.

**BACKUP WITHHOLDING -** We may be required by applicable law to withhold a certain percentage of the interest credited to your account in the following circumstances:

- You do not furnish to us your correct taxpayer identification number (TIN), which may be your Social Security Number;
- The IRS informs us that you furnished us with an incorrect TIN;
- The IRS informs us that you are subject to backup withholding because you did not report all of your reportable interest and dividends on your tax return;
- You do not certify to us that you are not subject to backup withholding;
- You do not certify your TIN to us; or
- Any other circumstances prescribed by applicable law which would require us to withhold interest.

If you do not have a TIN, you may apply for one by contacting your local IRS office. You may also contact your local IRS office if you would like additional information about interest withholding or other tax-related information. Our general policy and practice is to not open an account without a TIN.

**WAIVER OF NOTICES -** To the extent permitted by law, you waive any notice of non-payment, dishonor or protest regarding any items credited to or charged against your account. For example, if you deposit a check and it is returned unpaid or we receive a notice of nonpayment, we do not have to notify you unless required by federal Regulation CC or other law.

FEEDBACK (/FORM/WEBSITE-

**ACH AND WIRE TRANSFERS -** This agreement is subject to Article 4A of the Uniform Commercial Code - Fund Transfers as adopted in the state in which you have your account with us. If you originate a fund transfer and you identify by name and number a beneficiary financial institution, an intermediary financial institution or a beneficiary, we and every receiving or beneficiary financial institution may rely on the identifying number to make payment. We may rely on the number even if it identifies a financial institution, person or account other than the one named. You agree to be bound by automated clearing house association rules. These rules provide, among other things, that payments made to you, or originated by you, are provisional until final settlement is made through a Federal Reserve Bank or payment is otherwise made as provided in Article 4A-403(a) of the Uniform Commercial Code. If we do not receive such payment, we are entitled to a refund from you in the amount credited to your account and the party originating such payment will not be considered to have paid the amount so credited. Credit entries may be made by ACH. If we receive a payment order to credit an account you have with us by wire or ACH, we are not required to give you any notice of the payment order or credit.

**UNCLAIMED PROPERTY -** The law establishes procedures under which unclaimed property must be surrendered to the state. (We may have our own rules regarding dormant accounts, and if we charge a fee for dormant accounts it will be disclosed to you elsewhere.) Generally, the funds in your account are considered unclaimed if you have not had any activity or communication with us regarding your account over a period of years. Ask us if you want further information about the period of time or type of activity that will prevent your account from being unclaimed. If your funds are surrendered to the state, you may be able to reclaim them, but your claim must be presented to the state. Once your funds are surrendered, we no longer have any liability or responsibility with respect to the funds.

**UTMA ACCOUNTS -** Under the Uniform Transfers to Minors Act, the funds in the account are owned by the child who has unconditional use of the account when he or she reaches the age of majority. Before that time, the account may be accessed only by the custodian (or successor custodian), and the funds must be used for the benefit of the child. We, however, have no duty or agreement whatsoever to monitor or insure that the acts of the custodian (or successor custodian) are for the child's benefit. We are not responsible to monitor age or eligibility for an UTMA account, even though our records may include the minor's date of birth. It is the custodian's responsibility to properly distribute the funds in the account upon the minor's death or attainment of the age of majority. For this type of account, the child's SSN/TIN is used for the Backup Withholding Certification.

**UNLAWFUL INTERNET GAMBLING NOTICE -** Restricted transactions as defined in Federal Reserve Regulation GG are prohibited from being processed through this account or relationship. Restricted transactions generally include, but are not limited to, those in which credit, electronic fund transfers, checks, or drafts are knowingly accepted by gambling businesses in connection with the participation by others in unlawful Internet gambling.

FEEDBACK (/FORM/WEBSITE-

**INTERNATIONAL ACH TRANSACTIONS -** Financial institutions are required by law to scrutinize or verify any international ACH transaction (IAT) that they receive against the Specially Designated Nationals (SDN) list of the Office of Foreign Assets Control (OFAC). This action may, from time to time, cause us to temporarily suspend processing of an IAT and potentially affect the settlement and/or availability of such payments.

**FACSIMILE SIGNATURES -** You authorize us, at any time, to charge you for all checks, drafts, or other orders, for the payment of money, that are drawn on us regardless of by whom or by what means any facsimile signature may have been affixed so long as they resemble the applicable facsimile signature specimen filed with us, and contain the required number of signatures for this purpose.

**ADDITIONAL INFORMATION -** Your account may consist of a transaction sub account and a savings sub account. Funds not routinely needed to pay debts may be transferred to a savings sub account. We may periodically transfer funds between these two sub accounts. If your account is a plan on which interest is paid, your interest calculation will remain the same. Otherwise, the savings sub account will be non-interest bearing. The savings sub account will be governed by the rules governing our other savings accounts indicated within the Withdrawals Section of the Terms and Conditions of your Account (this document). This process, which is seamless to our members, will not affect your available balance, the interest you may earn, NCUA insurance protection, your monthly statement, or any other features of your account. It will allow us to lower our reserve requirement balance at the Federal Reserve Bank and increase the amount of funds available for loans and investments, thereby increasing our ability to serve our members.

## FUNDS AVAILABILITY DISCLOSURE

This policy statement applies to "transaction" accounts and share savings accounts. Transaction accounts, in general, are accounts which permit an unlimited number of payments to third persons and an unlimited number of telephone and preauthorized transfers to other accounts of yours with us. Share draft accounts are the most common transaction accounts. Feel free to ask us whether any of your other accounts might also be under this policy.

Our policy is to make funds from your check deposits available to you on the *next* business day after the day we receive your deposit, with the first $200 available on the same business day as the day of your deposit. Electronic direct deposits will be available on the day we receive the deposit. Cash, wire transfers, and some specified check deposits will also be available before the *next* business day, as detailed below. Once the funds are available, you can withdraw them in cash and we will use the funds to pay checks that you have written.

Please remember that even after we have made funds available to you, and you have withdrawn the funds, you are still responsible for checks you deposit that are returned to us unpaid and for any other problems involving your deposit.

FEEDBACK (/FORM/WEBSITE-

For determining the availability of your deposits, every day is a business day, except Saturdays, Sundays, and federal holidays. If you make a deposit before closing on a business day that we are open, we will consider that day to be the day of your deposit. However, if you make a deposit after closing or on a day we are not open, we will consider that the deposit was made on the next business day we are open.

### Same-Day Availability

Funds from the following deposits to your account will be available on the day we receive the deposit:

Electronic direct deposits;
U.S. Treasury checks that are payable to you;
Wire transfers;
Checks drawn on us that are payable to you;
Cash.

If you make the deposit in person to one of our employees, funds from the following deposits are also available on the day of your deposit:

- State and local government checks that are payable to you;
- Cashier's, certified, and teller's checks that are payable to you;
- Federal Reserve Bank checks, Federal Home Loan Bank checks, and postal money orders, if these items are payable to you.

If you do not make your deposit in person to one of our employees (for example, if you mail the deposit), funds from these deposits may be available on the same business day we receive your deposit.

### Other Check Deposits Subject to *Next*-Day Availability

The first $200 from a deposit of other checks will be available on the same business day as the day of your deposit. The remaining funds will be available on the *next* business day after the day of your deposit.

For example, if you deposit a check of $700 on a Monday, $200 of the deposit is available immediately. The remaining $500 is available on *Tuesday*.

If we cash a check for you that is drawn on another bank, we may withhold the availability of a corresponding amount of funds that are already in your account. Those funds will be available at the time funds from the check we cashed would have been available if you had deposited it.

If we accept for deposit a check that is drawn on another bank, we may make funds from the deposit available for withdrawal immediately but delay your availability to withdraw a corresponding amount of funds that you have on deposit in another account with us. The funds in the other account would then not be available for withdrawal until the time periods that are described elsewhere in this disclosure for the type of check that you deposited.

### LONGER DELAYS MAY APPLY

Funds you deposit by check may be delayed for a longer period under the following circumstances:

- We believe a check you deposit will not be paid;

FEEDBACK
(/FORM/WEBSITE-

- You deposit checks totaling more than $5,000 on any one day;
- You redeposit a check that has been returned unpaid;
- You have overdrawn your account repeatedly in the last six months;
- There is an emergency, such as failure of computer or communications equipment.

We will notify you if we delay your ability to withdraw funds for any of these reasons, and we will tell you when the funds will be available. They will generally be available no later than the seventh business day after the day of your deposit.

### SPECIAL RULES FOR NEW ACCOUNTS

If you are a new member, the following special rules may apply during the first 30 days your account is open.

Funds from electronic direct deposits and cash to your account will be available on the day we receive the deposit. Funds from deposits of wire transfers, and the first $5,000 of a day's total deposits of cashier's, certified, teller's, traveler's, and federal, state and local government checks will be available on the day of your deposit if the deposit meets certain conditions. For example, the checks must be payable to you (and you may have to use a special deposit slip). The excess over $5,000 will be available on the fifth business day after the day of your deposit. If your deposit of these checks (other than a U.S. Treasury check) is not made in person to one of our employees, the first $5,000 will not be available until the second business day after the day of your deposit.

*The first $200.00 from a deposit of other checks will be available on the next business day of your deposit. The remaining funds will be available on the fifth business day after the day of your deposit.*

### DEPOSITS AT AUTOMATED TELLER MACHINES

If you make a deposit at an ATM on a business day that we are open *prior to 6:00 P.M.*, we will consider that day to be the date of your deposit. However, if you make a deposit on a day we are not open, we will consider that the deposit was made on the next business day we are open. Funds from any deposits (cash or checks) made at automated teller machines (ATMs) we own or operate will be available on the second business day after the day of deposit, except that U.S. Treasury checks that are payable to you will be available on the first business day after the day of deposit. Also, the first $200 of a deposit will be available on the first business day after the day of deposit. Checks drawn on Navigant Credit Union will be available on the first business day after the day of deposit if the deposit is made at an ATM located on our premises.

Rev. 5/31/2017
© 2016 Wolters Kluwer Financial Services – Bankers Systems™
Form AIB-N-CU   6/1/2016   Custom TCM-46CUs,3p   200695200-010

FEEDBACK
(/FORM/WEBSITE-

ROUTING#
211589828
NMLS# 462987

SECURE
LOGIN
(https://www.navigantcu
core/app/login/consume
#)

Become a member
(/newaccount)

Find a location (/locations)

401.233.4700 (/contact-us)

Send an email (/contact-us)

Calculators
(/personal/calculators)

ESPAÑOL (/ESPANOL)   CAREERS (/CAREERS)

PRIVACY POLICY (/PRIVACY-POLICY)   SECURITY (/SECURITY)

DISCLOSURES (/NODE/85)

Equal Housing Lender (https://portal.hud.gov/hudportal/HUD?src=/program_offices/fair_housing_equal_opp)   NCUA   Navigant Credit
Union is federally insured by NCUA (https://www.ncua.gov/Pages/default.aspx)

All accounts and products are subject to approval.
© 2019 Navigant Credit Union. All rights reserved.

FEEDBACK
(/FORM/WEBSITE-

**Exhibit B**

## WHAT YOU NEED TO KNOW ABOUT OVERDRAFTS AND OVERDRAFT FEES

An <u>overdraft</u> occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway.  We can cover your overdrafts in two different ways:

1.  We have <u>standard overdraft practices</u> that come with your account.

2.  We also offer <u>overdraft protection plans</u>, such as a link to another account or a line of credit, which may be less costly than our standard overdraft practices.  To learn more, ask us about these plans.

This notice explains our <u>standard overdraft practices</u>.

➢ **What are the <u>standard overdraft practices</u> that come with my account?**

We <u>do</u> authorize and pay overdrafts for the following types of transactions:

- Checks and other transactions made using your checking account number
- Automatic bill payments

We <u>will not</u> authorize and pay overdrafts for the following types of transactions without your consent.

- ATM transactions
- Everyday debit card transactions

We pay overdrafts at our discretion, which means we <u>do not guarantee</u> that we will always authorize and pay any type of transaction.

If we do <u>not</u> authorize and pay an overdraft, your transaction will be declined.

➢ **What fees will I be charged if Navigant Credit Union pays my overdraft?**

Under our standard overdraft practices:

- We will charge you a fee of up to **$34** each time we pay an overdraft
- For Consumer Accounts there is a limit of 5 overdraft fees ($170) per day on the total fees we can charge you for overdrawing your account.  This exception does not apply to business accounts.

➢ **What if I want Navigant Credit Union to authorize and pay overdrafts on my ATM and everyday debit card transactions?**

If you want us to authorize and pay overdrafts on ATM and everyday debit card transactions, call (401) 233-4700, visit our website at http://www.navigantcu.org, complete the form below and present it at a branch or mail it to: 1005 Douglas Pike, Smithfield, RI 02917.  You can revoke your authorization for Navigant Credit Union to pay these overdrafts at any time by any of the above methods.  Your revocation must include both your name and your account number so that we can properly identify your account.

_____   I <u>do not</u> want Navigant Credit Union to authorize and pay overdrafts on my ATM and everyday debit card transactions.

_____   I want Navigant Credit Union to authorize and pay overdrafts on my ATM and everyday debit card transactions.

Printed Name:   _____

Date:   _____

Account Number:   _____

# Exhibit C



# Consumer Fee Schedule
### Effective as of 11/21/17

## Account Services

| | |
|---|---|
| Personal Checking Low Balance Fee | $10.00 |

(Fee waived if $500 minimum daily balance is
maintained, a direct deposit into the account
is established or you are 50 years or older)

| | |
|---|---|
| Relationship Checking Low Balance Fee | $12.00 |

(Fee waived if $5,000 combined aggregate deposit
minimum daily balance is maintained)

| | |
|---|---|
| Cash Reserve Line of Credit Annual Fee | $15.00 |
| **Overdraft Transfer Fee** | **$3.00** |
| **Excess Transaction Fee** | **$5.00** |
| Insufficient Funds Fee (Returned) | $34.00 |
| Insufficient Funds Fee (Paid) | $34.00 |
| Uncollected Funds Fee | $34.00 |
| **Redeposit Check Fee** | **$15.00** |
| **Returned Check Fee** | **$15.00** |
| **Foreign Check Collection** | **$25.00** |
| ACH Origination | $5.00 |
| **Stop Payment** | |
| • **Money Order** | **$30.00** |
| • **Official Check** | **$30.00** |
| • **Personal Check** | **$30.00** |
| • **ACH** | **$30.00** |
| • **Bill Payment** | **$30.00** |
| Copy of Check | $5.00 |
| Copy of Statement | $5.00 |
| Temporary Checks (4) | FREE |

(4 for $10 thereafter)

| | |
|---|---|
| Early Club Close-out Fee | $5.00 |
| Lost Passbook Fee | $15.00 |
| **IRA Direct Transfer (out)** | **$30.00** |

## ATM

| | |
|---|---|
| ATM Foreign Transaction Fee | $2.00 |
| ATM / Debit Card Replacement | $5.00 |
| **ATM / Debit Card Replacement (Rush)** | **$25.00** |
| ATM / Debit Card Overdraft Fee | $34.00 |
| PIN Replacement | FREE |
| Copy of Sales Draft | FREE |
| Balance Inquiry | FREE |
| Point of Sales Transactions | FREE |

## Miscellaneous

| | |
|---|---|
| Gift Card | $3.95 |
| Money Order | $4.00 |
| Cashier's Check | $5.00 |
| Research Per Hour (1 Hour Minimum) | $30.00 |
| Account Balancing Assistance | FREE |
| **Account Verification** | **$10.00** |
| **Inactivity Fee** | **$5.00** |

(No activity for 12 months.)

| | |
|---|---|
| Escheatment | $5.00 |
| **Levy / Garnishment Processing** | **$100.00** |
| Wire Transfers (In) | $12.00 |
| Wire Transfers (Out – Domestic) | $20.00 |
| **Wire Transfers (Out – International)** | **$40.00** |
| Undeliverable Mail | $5.00 |
| Online Banking | FREE |
| eStatements | FREE |
| Bill Payment | FREE |
| Express Bill Payment | |
| • Check | $25.00 |
| • Electronic | $5.00 |
| Funds Transfer | |
| • Standard Inbound | FREE |
| • Standard Outbound | $3.00 |
| • Next Day Inbound | FREE |
| • Next Day Outbound | $9.99 |
| Popmoney | |
| • Standard Outbound | FREE |
| • Request Funds | FREE |
| • Next Day Outbound | $9.99 |
| Convenience Fee (Loan Payment by Phone) | $15.00 |

## Safety Deposit Boxes

| | |
|---|---|
| Small Box (2x5) | $30.00 |
| Small Box (3x5) | $45.00 |
| Medium Box (3x10) | $65.00 |
| Medium Box (5.5x4.5) | $65.00 |
| Medium Box (5x5) | $65.00 |
| Large Box (5x10) | $125.00 |
| X-Large Box (10x10) | $175.00 |
| Safe Deposit Box Drilling (Minimum) | $150.00 |
| Safe Deposit Box Late Fee | $15.00 |
| Safe Deposit Box Key Replacement | $20.00 |

## 401.233.4700 | navigantcu.org

Federally insured by the National Credit Union Administration